All right, let's get started. We have one case today with this panel and then we'll swap panels and commence with the rest of the cases a few minutes after the conclusion of this one. Our first case is 24-6227 Chieftain Royalty Company v. Enervest Energy. And starting with the appellant, is it Mr. Pence first? Your Honor, we spoke yesterday and agreed that Mr. Isaacson will go first. Okay. And then I will follow. Thank you. All right. Good morning, Your Honor. May it please the Court. Eric Allen Isaacson. I hope to take about five minutes to make some points. Mr. Pence and I are united in the belief that the fee award in this case is excessive, although our approach to the issues are a little bit different. Who's your client again? My client is C. Benjamin Nutley as trustee for the Nutley Estate. And the case is one that's been around for quite a while. I think the initial settlement and fee award were back in 2015. Judge Giusti awarded one-third of the common fund as attorney's fees, despite the fact that class counsel did not state their precise time and were unwilling to document it. In fact, said they didn't keep time records. This court reversed saying you've got to apply federal law. I mean, reversed saying you've got to apply state law, Oklahoma Supreme Court law, on attorney's fees. And it looks like the Oklahoma Supreme Court requires a lodestar analysis. It remanded and the Oklahoma Supreme Court in another case called Strack said, yeah, we require a lodestar analysis. The question in that case was whether attorney's fees in a common fund can be determined on the basis of a percentage of the fund or lodestar. The court says, you know, percentage of the fund and lodestar both are useful. You can start with one or the other, but it's important that it be reasonable and you got to check one against the other. The Oklahoma Supreme Court said that there's a strong presumption that the lodestar, the unenhanced lodestar, is sufficient. And it checked the fee award in that case against the unenhanced lodestar and said, well, it's way above that. That's suspicious. It also said that percentage awards can be reasonable if they're between 20% and 30% in a complex common fund litigation. Then the median is 25. Let's check the fee in this case against 25%. And again, the fee was way above what the attorneys would have gotten with a 25% fee award. What was Judge Digesti's approach? Was it to follow Strack and analyze the case first in terms of the lodestar amount and the amount that a 25% fee award would produce? No, he reaffirmed his original one-third of the fund and he did it without following what Strack says you got to do. Strack says, check it against the lodestar, check it against 25%. Didn't he do that? Essentially, is your argument that Strack is a hard cap? What's the number? No, I don't think Strack is necessarily a hard cap, but Strack says we rarely approve of a fee award above 1.5. You recognized in your dissent, partial dissent from the last time the case was up, that there's a strong presumption that the lodestar is sufficient and that the lodestar amount is objective. Well, if there's a strong presumption that the unenhanced lodestar is sufficient, there's got to be a pretty strong explanation to deviate upwards. And the Oklahoma Supreme Court says we rarely have approved a lodestar multiplier more than 1.5. The lodestar multiplier in this case is lots more than 1.5. What's the inadequacy then in Judge DiGiusti's explanation? If there's some delta where you can vary upward from the Strack range, why was the court's explanation of its rationale inadequate here? Abusive discretion. The explanation of its rationale was inadequate for a number of reasons. One, it didn't recognize that it's a truly strong presumption that should be rarely departed from, and it was basically justifying, backing into to justify the original one-third fee award rather than starting with the Oklahoma Supreme Court's presumptions. And it also was applying the multiplier to a much larger lodestar than was warranted. It's an $8 million award story as calculated by the court. Mr. Pence has some reasons to think that the lodestar was a lot closer to $5 million if you wanted to calculate it legitimately. And I'd like, if I could, to reserve some time for rebuttal, like three minutes for Mr. Pence and myself both, and to cede the floor to Mr. Pence to talk about the lodestar. All right, thank you. Mr. Pence, go ahead. Thank you, Your Honors. John Pence on behalf of Appellant Danny George. The parties are in agreement now that Strack is the definitive statement of Oklahoma law on the award of attorney's fees in a class action. And obviously, to the extent that Strack conflicts with the prior case of Burke, Strack would control. But in fact, there is no conflict with the Strack standard, and Burke can easily be explained based on the new standard that time is properly included in lodestar. And what we're really asking there is that, when we were asking, can you include it in lodestar, we're asking, is it properly chargeable to the class? It's includable in lodestar when it's helpful to the litigation. And the class counsel in Burke was indeed, did indeed meet that standard. First and foremost, class counsel in Burke did submit his lodestar data. Now, the court did overcompensate him there without showing its work. But as class counsel, he had no control over what the court was going to do once he submitted his lodestar. Furthermore, there was no Oklahoma law on the award of attorney's fees in a class action at that time. Burke was the case that kind of established the law that it's based on lodestar in Oklahoma and that lodestar multipliers are modest. They really do exceed 1.5. Can I ask you about that, Mr. Pence? And you and Mr. Isaacson have referred to Justice Winchester's discussion about 1.5. Does that, is that a, is that a soft cap or whatever you call it, guidepost to remain in perpetuity? Justice Winchester was referring to the reported cases as of the time he issued the opinion in STRAC. So, let's say in five years, does that mean that we will again be confronted with, say, a multiplier of 1.85 or 2.15 that Judge Giusti had and say, well, Justice Winchester said back in 2021, based on the reported cases that he was looking at, that any multiplier over 1.5 is rarely to be, not never, but rarely to be approved. How long do we subscribe to this benchmark in light of the fact that he was relying on historical information? Well, Your Honor, I would say at least in this case, the strong similarity between STRAC and this case, they were both gas royalty class actions. They were both well, the STRAC court found that that case was very desirable, that it presented low risk, but that they did a good job and that there was no penalty implied in that fee award. They were not penalizing class counsel for making any error or mistake. Unlike here, where class counsel committed malpractice and made a frivolous argument to the district court. When class counsel failed to submit any Lodestar data in connection with their 2015 fee petition, the following three years of appeal were just a waste of time. And it's wrong to charge the class for class counsel's malpractice in failing to submit its Lodestar data in 2015. And then, you know, to double down by going scorched earth on the appeal, taking it all the way up to the Supreme Court. When the question presented was simply, you know, what law applies in a diversity class action, the answer to that has been state law ever since Erie. So, the amount of time that class counsel wasted on that first appeal, you know, they're the ones that should have to bear that time. It was for their own, they were chasing their own attorney's fee that, by the way, the fact that the fee that Judge DeGiussi has awarded 33% each time, three different times, doesn't cure that first fee award. That was wrong when made. That was a, that initial 33% fee award represented a 3.46 multiplier. And there is simply no way, you know, getting back to your question, Judge Bacharach, there's no way you're going to square that with anything that was set in strack. I mean, that was clearly beyond the payout. We may get a multiplier of two or 2.5, but 3.44. That's water under the bridge. I mean, that was, that was reversed. Here we are, you know, based on, let's say, let's go to Chieftain 2 in where Judge DeGiussi, now Mr. Isaacson referred to, you know, I understand one criticism is that maybe he started with a 2.15 multiplier rather than starting freshly. But, you know, putting that argument aside, Judge DeGiussi didn't make the error that you're referring to in Chieftain 1. Here, now that we are in Chieftain 3, he did purport to rely on the statutory factors that is consonant with Justice Winchester's opinion in strack. Now one could argue that, that I don't remember in West, Justice Winchester referring to low risk. I do remember he said that these large royalty cases in Oklahoma are attractive, you know, to firms, which is true here. But one of the statutory factors is results obtained. And we don't know from Chief, from Strack, you know, what was that $56 million award of the common fund in comparison to the claim, to the claimed amount. And why isn't it reasonable here for Justice, Judge DeGiussi to say, well, an award of $52 to $55 million, based on the very limited upside for statutory interest, that factor results obtained that is required to be considered was enough to justify his exercise of discretion. Why doesn't that differentiate Strack? And why do we have an abuse of discretion? Well, my response to that would be because of the limiting factor of the Lodestar analysis. You know, perhaps Judge DeGiussi has a basis for exceeding the 25% benchmark here because of what he views as 100% recovery. But Strack cautions that you have to also compare that to what would be produced by the Lodestar method. And because I believe that none of that time spent on Chieftain 1, which after all, was an incorrect decision when made, and the fact that it's now been kind of cured by the inclusion of that $3 million, I mean, it's kind of a circular question. We don't believe that that $3 million should be chargeable to the class. And it ends up to, you know, being $6.4 million when it's multiplied by $2.15. Because that was, you know, this court even said it in Chieftain 1. They said, you know, we wish class counsel had done their homework on Oklahoma law. And that simply means putting in some Lodestar data. But if that had been done... Well, Judge Hartz, I think, was referring to keeping contemporaneous data. Judge DeGiussi found that the reconstruction of the data is reasonable. I think we're bound by the clear error standard. So I don't know why that dicta in Chieftain 1 would preclude us from finding that Judge DeGiussi didn't commit clear error in approving the reconstructed time records. Judge Kelly, your speaker's off if you wanted to ask a question. Well, I can't see anybody. There's something wrong with the presentation. Can you hear? I can hear. Okay. And my final point would be that I'm aware that this court awarded time to the lead plaintiff based on time he spent reviewing those briefs in Chieftain 1. But there's a difference between, you know, not wanting to penalize a lead plaintiff for doing something he was asked to do by his counsel. And he didn't really know, you know, I doubt he was aware of the Oklahoma fee law. And class counsel who should have been aware of that and who could have avoided all of that time, all of that Lodestar if they had simply presented their Lodestar in connection with their 2015 fee petition. And unless you have any further questions, I'll... Yeah, you wanted to read the time for sure. Okay. Okay. Let's hear from Mr. Beckworth. May it please the court. Your honors, I'm Brad Beckworth, and I am one of the members of the class counsel here. So we'll be arguing on behalf of ourselves as the appellee. This case was filed in 2011 when I was 39 years old. I'm now 53. Judge Tinkovich, we've been before you at least once in this case. So it's good to see... Charles Dickens could use this case for a plot. I agree. And I hope that this will be the last of it. Importantly, this is the first time that Judge DiGiusti's opinion on the fee issue will be looked at on the actual merits. And two of his prior decisions have come before this court on the merits. And when that has happened, he's been affirmed. One was the decision about whether the settlement should be approved and he should reject the attack against the settlement by these objectors. That was affirmed in Chieftain 1 when we went to re-hearing on BOMP. And then in Chieftain 2, his merits-based decision on the incentive fee award was approved on the merits or affirmed on the merits. So here, I think we're down to a singular issue. And that issue is, did Judge DiGiusti act within his discretion when he followed this court's mandate and followed STRAC to apply that law to the facts of this case and find that a fee percentage of 31.5% was appropriate in the face of a $55 million settlement? And the answer to that is, yes, he exercised his discretion and acted within it. Just stopping there for one second to be very clear. The fee award is 31.5% of the settlement value, which is undisputed. This idea that it's a third is a little confusing because it's a third of the cash. But the fee award is 31.5%, and that's reflected in Judge DiGiusti's most recent order. Mr. Beckworth, let me test that. Now, you say that he was entitled to go upward to 31.5%. In Justice Winchester's opinion on page 617, he talks about the normal range of the percentage of 20 to 30%. But interestingly, the opinion has a very specific trigger point for varying from that benchmark, and it's a prepositional phrase, with debt deviations from that range when the fund is extraordinarily large or small relative to the hours of work expended by the attorneys. That follows a discussion saying that when the common fund is unusually large, there's economies of scale, which would suggest that the percentage should be lower, not higher. And there, of course, we were talking about a common fund in STRAC of $56 million. Here, we're talking about either $52 or $55 million. So I didn't see anything in Judge DiGiusti's opinions, any of those opinions, to suggest that he was going to 31.5% or 33%, whatever you call it, based on deviations because the fund is extraordinarily large or small relative to the work expended. If he had followed that, presumably, he would be going below the 20 to 30% benchmark, not above it. Your Honor, let me respond to that, and I respectfully disagree on several levels. First, I know you're surprised by that. First, you have to go back and look at what happened in STRAC, and we were amici in that case. We've tried a lot of the oil and gas cases in Oklahoma, and in fact, we won affirmance on a verdict against Sunoco on Monday from this court. The defense lawyer in that case, at trial, was the objector in STRAC, so we're very familiar with it. What happened in STRAC was pretty straightforward. There was a 40% fee contract, and the trial court extended that contract and said 40% was the class rep fee, 40% should be the fee in the case. When you go through the STRAC opinion, it's very clear that what the Supreme Court had trouble with was the court didn't go through the Johnson factors or 2023 factors, as they're called in Oklahoma. Now, if you go back to what happened with Judge DiGiusti here, he did it right the first time. We asked for a 40% fee. His original opinion in 2015 says, I'm not going to just carry that fee forward. I'm going to go and do a fulsome Johnson factor 2023 analysis of all the factors, and he decided to downward depart from 40% to a third or 31.5, so that's the first answer to that. Secondly, when you look at what I think what you're pointing to as economies of scale, that's real. I do a lot of this. You're talking about mega fund cases. If it's a billion-dollar fund, then sometimes it's so out of whack if you had a lodestar of, say, $5 million, but that's not what happened here. In Oklahoma, just like in your opinions, and take Vulgaris, for example, which really STRAC and Vulgaris are on all fours, the idea is to get to a reasonable defeat, and either the district court has discretion or he doesn't, and when you have a range, that means you have discretion. Here, most importantly, differing from STRAC is we had 100% recovery. I know that's true because I did it, and our expert report on that is not disputed. It was 100% recovery. That is the most important factor in Oklahoma on any court analysis, whether it's a lodestar or a percentage of the fee. The second most important thing is award in similar cases, and Judge Timkovich, when you look at Chieftain 2, for example, that panel looked at awards in similar cases for the class representative. The same is true here. This record is full of expert opinions by trial court judges and scholars and practitioners that say both before and after STRAC, 40% is really the common fee in cases, no matter how big they are in Oklahoma. Yes, sir. Yeah, but the problem with that, Mr. Beckworth, is Judge Hetherington, Professor Gensler, Judge Burrage, Dan Little, all of those affidavits were filed three years before STRAC was even decided, and they all rely, none of those rely, they all rely on on state district court rulings three years before Justice Winchester confronted exactly the same sort of analysis and said, we have a 40% benchmark that should be applied for this common fund fee award. And Justice Winchester said, not state district courts in Oklahoma in the 77 counties have very rarely approved it. We, the Oklahoma Supreme Court, have rarely approved it. And in fact, expressly repudiated, rejected a 40% percentage award. And so I don't know why the affidavits, none of which included a single settlement or fee award more recently than three years before STRAC was decided, would justify us deviating from this 30, 20 to 30% benchmark. So I don't, so Judge Giusti seems to have made just a factual error by crediting those affidavits, all of which preceded STRAC. Well, Your Honor, I'm sorry, what? No, I just said, what am I missing? I might be missing something. Sure, I believe you are with all due respect. First, let's be clear about STRAC. It's not a starburst opinion. STRAC didn't say this is new law. STRAC says we're looking at what the law is and applying it to the facts of this specific case. Again, courts either have discretion or they don't. STRAC cited this court's opinion in Brown. This court also cited Brown in Vulgaris. In Vulgaris, the objector tried to do exactly what they tried to do here and say, oh, if you look at this court's opinion in Gottlieb, there was a 25% benchmark because the court in Gottlieb talked about 25%. This court said, nope, that's not right. We didn't adopt a benchmark. The range is what it is in Brown. It can be high or low. That's exactly what happened to STRAC. They didn't adopt a benchmark in that case, nothing of the sort. They cited a range. They cited this court's range. That's what it is. In Brown, it goes up to 37%. Now, let's go back to your point about who filed those declarations. It's correct but also not correct because we submitted evidence to the court of post-STRAC decisions. They're in our briefs here. They're in the record. One of them is, for example, Judge Heaton. Judge Heaton was applying a stipulation that applied federal common law, not Oklahoma law. But he looked at what has been happening since. It's absolutely what he did. And you can look at, we've put them in the record. A lot of those are our cases. There is discretion and a range. We're really quibbling over 1.5% here. With a judge who has had this case for over 10 years, this court's precedent says we don't go hunting for error, that we give discretion to a judge who has been in a case. Y'all's opinion in Syngenta is one example of that. Judge Holmes wrote, I think, that opinion. This judge knows this case. And let's go back and talk about the record that was before him. Those lawyers and judges didn't just look at a percentage, Your Honor. That's not what they did. They looked at the time records. They looked at the load star. They looked at the result achieved. They looked at similar awards in other cases. That's the one you just asked about. But there's 13 factors. And that wasn't just some light group of experts. That was Michael Burge. I think many of you know him. That was Pat Ryan, my co-counsel at Sunoco, who just passed away. We may think that they're the most brilliant individuals on the planet, but I don't know that we can affirm based on the fact that we have high regard for the credibility of the experts. The were without knowledge that three years later that Justice Winchester would allow only a limited exception when the deviations from that range are when the fund is extraordinarily large or small relative to the hours of work expended by the attorneys. So maybe Justice Winchester was wrong, but I don't know how we can just ignore that based on our high regard for the credibility of your Well, Your Honor, I'm not asking you to ignore it. I'm asking you to do what Strack says. This court said we had to follow Oklahoma Supreme Court law, and Oklahoma Supreme Court says that judges have discretion and that you have to look at the unique facts before the court. Strack was a case where certification was denied. Strack was a case where they did not get 100% of damages. And one thing, if you look at that opinion carefully, which is clearly you have, there was another $3 million that they were going to get there on top of what was at issue in the $19 million fee award. I know those lawyers very well. I know exactly what happened there because, again, we analyzed it and filed the amicus briefs in that case. It's not the same case. We got 100% here. And if you're going to do a lodestar crosscheck, which is what they're saying is required, then let's do the lodestar crosscheck. But let's also do it as Judge DiGiusti did twice. He did it two times, one on the percentage and one on the fee amount. And you had your response to the claim that you failed to provide lodestar data early on, which, you know, dragged out Chieftain One and, you know, really created maybe an unnecessary appeal. Well, Your Honor, I have several responses to it. One, there was a strategic reason. And two, the objectors have misled this court all along. They're still doing it. I was the one they were to there. I never said, and we've given you the full record, I never said that we didn't have time records. I said that I personally didn't keep them. I'm one of many here. We did. And I said, we do have time records. And you have those time records before you. The issue of whether they were submitted was very simple. At the time, there was no Oklahoma court that said you had to do a lodestar. If you look at STRAC, I think we should do one, but the law should not must. That's what it says. We were following Oklahoma state court and federal jurisprudence and relying on prior authority here. But there was also a strategic reason, Your Honor. We, and Judge DiGiusti pointed to this. We had a case that originally this case was SM. InterVest bought some of the wells. We were in hot litigation against SM. We did not want to submit time records that our adversaries in that case could see and gain an advantage of. And that carried forward even after we went back and put our time records in, which is why there was redactions and we were originally allowed to put them under seal. But we produce time records. And I think it's critically important going back to Judge Backert's comments about who these judges were and whether you respect them or not. Judge Van Dyke tried more Oklahoma oil and gas cases than any other judge as a state court judge. Judge Hetherington tried our opioid case. He tried the tobacco case. These are judges that practice in Oklahoma, both as lawyers and as judges, and they know the fee law there, and they know the unique circumstances of our case and our work in these cases. And I think Judge DiGiusti was entirely allowed to rely upon these experts. And I should mention that none of their factual findings were challenged. They objected to using certain experts, Justice Watt and Glenn Coffey, who wrote 2023. But Judge DiGiusti struck those. Everyone else, he said, look, this goes to the weight of my analysis. And, Your Honor, it was in his discretion to rely on that. Well, before you sit down, I also was concerned. The appeal to the United States Supreme Court looks pretty dubious to me. And I guess the fee award would include the cost of that issue to the Supreme Court. No? You're shaking your head. Yes, sir. May I continue? I see my time's up. Yeah, go ahead and answer my question. Yes. It's very clear in Judge DiGiusti's order and in our declaration that none of that time was submitted seeking cert. None of it, right? What we submitted was through the rehearing en banc, and I think we were preparing cert at the time that we submitted our fee declarations. So that's not included in there. But the en banc petition in the Tenth Circuit would be? Yes, Your Honor. And let's go back to that. They attacked the settlement. And when the Tenth Circuit issued Chieftain 1, it did not affirm the settlement. And part of our effort in rehearing en banc was to get that clarified. The court did not grant rehearing, but it's a non-pro tonic, I guess is what it was called, to clarify that the settlement was indeed affirmed. That's critical, if I may just continue, because InterVest went to bankruptcy. And had that order not have been won by us against their attack, this class would have gotten nothing. We would have gone into an adversarial proceeding. Let me just check what I said to make sure I said it right. Yeah, go ahead and do that and then wrap up. Okay, that's correct. The time that we spent drafting the cert petition was included, but we also put in there several hundred hours about what would happen if cert was granted. That was not included. We just showed it, but Judge DeGiusti made clear he didn't consider it, nor did we request it. So I want to make sure I got that exactly right. All right. Thank you, Mr. Beckberg. Mr. Isaacson or Mr. Pence? So getting it exactly right, he concedes the time put into the cert petition was in fact included in the lodestar. I think that you focused on whether the 1.5 is a hard cap. I mean, it's pretty firm. I think it's supposed to be pretty firm. And whether it can change over time, I think you would want to look at reported Oklahoma decisions, not unreported district court opinions that are applying a federal common law. The original decision in this case from the 10th Circuit rejected the idea that a federal common law controls here. It said apply Oklahoma law, and Oklahoma law is what Strack says. Now, Strack has been applied in one published Oklahoma decision called Folsom, where the court said the results achieved were extraordinary, and it reduced the fee award from a multiplier of 3 to a multiplier of 1.3. That's well under the 1.5. Now, a multiplier of 1.5 in this case would generate a fee award of $12 million, not $17.3 A 25% fee award in this case would generate a fee of $13 million, not $17.3 million. $17.3 million was way too much. And we want to go back and look at the reconstructed time records. I think Mr. Beckworth did say that they didn't keep time records, and it turns out that what was put in for many of the time records were daily time slips with the name of the case having enervest. The case was filed in 2011 in Oklahoma State Court and removed to federal court. Enervest was not added until September of 2024 on the eve of settlement. So those time slips were all bogus. They're all reconstructed after the fact on the daily basis with the wrong case name on them. Did you raise that in the district court? Yes, we raised that argument in the district court. We followed a motion. Nutley followed a motion to strike the records and the judge rejected the motion. He denied the motion. And given the abuse of discretion standard, that didn't seem like the strongest point to be making on appeal, to take an appeal from striking those time records. But the fact of the matter is that Mr. Beckworth and his colleagues did not keep time records for the most part. The time records were reconstructed, that is absolutely clear from the record. Your time's over. Go ahead and finish up. I'd like to finish up. I apologize to Mr. Pence if I've taken his rebuttal time. All right. Well, I think you did. But Mr. Pence, I'll give you 60 seconds if you want. Thank you, Your Honor. I appreciate that. I believe I heard Mr. Beckworth say that in 2015, there was no Oklahoma court, this is an exact quote, that said you had to do Lodestar. I mean, even Judge DeGiusti said in his opinion that if we need to follow Oklahoma law, we don't have enough information to make a fee award right now. I don't know how Mr. Beckworth could possibly say that. It was clearly required then. His argument then was we don't have to follow Oklahoma law. We can follow this federal common law that he apparently still believes in. He believes that what constitutes federal common law are these unreported decisions where you basically stipulate around the law of Oklahoma, and they never see the light of day. The law that governed was the law announced in Burke and then confirmed in Strack, which is you have to produce your Lodestar, which is why the class counsel invited the error that required and led to Chieftain 1, and they shouldn't be able to charge the class for that. All right. Thank you, counsel. I think we understand and appreciate your arguments. Counsel are excused, and the case will be submitted. This panel will be adjourned, and we'll reconvene in about 60 to 120 seconds. Thank you. Thank you.